UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ALLSCRIPTS HEALTHCARE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 15 C 5754 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| ETRANSMEDIA TECHNOLOGY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**M**EMORANDUM **O**PINION AND **O**RDER

Allscripts Healthcare, LLC brought this suit against Etransmedia Technology, Inc. in the Circuit Court of Cook County, Illinois, and Etransmedia removed it under the diversity jurisdiction. Docs. 2, 23. On Etransmedia's motion, the court compelled the parties to arbitrate Allscripts's claims and stayed the litigation. Docs. 64-65 (reported at 188 F. Supp. 3d 696 (N.D. Ill. 2016)). After the arbitrators dismissed the arbitration, Doc. 73-1, the court lifted the stay and litigation resumed, Doc. 98. With a jury trial set for early February 2020, Doc. 207, Etransmedia moves for summary judgment, Doc. 202. The motion is granted in part and denied in part.

**Background**

The court recites the facts as favorably to Allscripts as the record and Local Rule 56.1 permit. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). At this juncture, the court must assume the truth of those facts, but does not vouch for them. *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

Under a contract called the "Partner Agreement," Etransmedia acted as a reseller of Allscripts software. Doc. 217 at p. 11, ¶ 34. In early September 2015, the parties attempted to negotiate a settlement of outstanding disputes at a mediation in New York City. *Id.* at p. 3, ¶ 7.

1

When the mediation ended, the parties signed a document they refer to as the "Term Sheet," *id*. at pp. 3-4, ¶¶ 10-11, which is an untitled, two-page list of bullet-pointed terms, Doc. 202-11. The Term Sheet purports to provide for Etransmedia to sell its Allscripts client base to Allscripts in exchange for the dissolution of the parties' relationship and resolution of all outstanding disputes. Doc. 216 at 8; Doc. 202-11.

The Term Sheet includes provisions regarding what Allscripts would pay Etransmedia, which clients would be transferred, and the method and timing of the transfers. Doc. 224 at ¶ 3; Doc. 202-11 at 1. It also provides for the return of unsold software licenses, a two-year non-compete agreement, and a commitment to use "best efforts to cooperate to achieve implementation prior to October 1 of the MU 2014 package to all … clients who indicate their election to receive it." Doc. 224 at ¶ 4; Doc. 202-11 at 1. The Term Sheet further provides: "Parties will enter into comprehensive settlement agreement memorializing terms contained herein on or before October 1. Agreement will provide for filing of stipulations of dismissal with prejudice in all pending actions between the parties as soon as reasonably possible after execution." Doc. 202-11 at 2.

Several bullet points on the Term Sheet concern the contract breaches alleged by Allscripts in this case. One is titled "Representations and warranties as to:" and is followed by several sub-bullets, including "Estimated average revenue per license = approximately $716"; "Number of practices"; "Number of providers"; "Provide info regarding contract start dates AEO"; "Etransmedia will provide some piece of paper on each rep AEO"; "Estimated percentage of licenses on subscription model – approx. 94%"; "All contracts have 1 year automatic renewal with 90 days notice of termination"; and "Etransmedia has lost very few Professional clients to anyone other than Allscripts." Doc. 202-11 at 1. Another bullet point

reads: "Parties agree to seek to extend the stay of Illinois and North Carolina litigations and arbitration for an additional 30 days (through October 15) or such further additional time as may be necessary to effectuate the terms hereof." *Id*. at 1-2.

The Term Sheet expressly leaves open several terms—including those regarding the mechanics of Allscripts's payments and the release of certain claims—to be resolved in the comprehensive settlement agreement that the Term Sheet contemplated would be finalized by October 1. The Term Sheet states that "[p]ayment will be disbursed in accordance with terms of executed settlement agreement," and "Timing of payment: [by X DATE]." Doc. 202-11 at 1. As to mutual releases, it provides only that the "Parties will execute mutually satisfactory general releases of all claims." *Id*. at 2. And as to indemnification for claims brought by others, it states: "Issues related to cross-claims for indemnification arising from third-party claims not yet resolved. The parties will address these issues in the final settlement agreement." *Ibid*.

The parties engaged in discussions regarding a comprehensive settlement agreement. Doc. 217 at pp. 4-5, ¶ 14. The parties did not reach agreement by the October 1 deadline and continued to negotiate into October. *Id*. at p. 5, ¶ 15. Ultimately, the parties never signed a comprehensive settlement agreement. *Id*. at p. 9, ¶ 28. Allscripts nonetheless worked to implement its "Meaningful Use 2014" software package—referred to in the Term Sheet as "MU 2014"—in the days following execution of the Term Sheet, Doc. 224 at ¶ 21, providing implementation to every Etransmedia client requesting it, *id*. at ¶ 22. (Etransmedia argues that this fact is not supported by the evidence cited by Allscripts. However, the evidence—testimony by representatives of both Allscripts and Etransmedia that they were unaware of any clients who wanted a MU 2014 and did not receive one—supports the fact.) In addition, Etransmedia required that its clients who used Allscripts software and sought a data transfer from Etransmedia

3

to another vendor sign contracts agreeing that the client "shall not permit Allscripts or any of its affiliates or subsidiaries to host any data transferred as a result of" those contracts. Doc. 224 at pp. 16-17, ¶¶ 28-29. (Etransmedia objects to this fact, arguing that the cited evidence does not support it. But the court quotes directly from the contract, and Etransmedia representative Renee Smith testified that it is the "standard contract form [Etransmedia] would use with people who are asking for their data to be released for the transfer." Doc. 217-8 at 24; Doc. 217-8 at 24; Doc. 217-17 at 4.) At least one client signed such a contract on October 8, 2015. Doc. 217-17.

## Discussion

The operative complaint sets forth claims for breach of implied contract, unjust enrichment, defamation, tortious interference with prospective economic advantage, unfair and deceptive trade practices, declaratory relief, and breach of the Term Sheet. Doc. 23. Allscripts has voluntarily withdrawn the declaratory judgment claim, Doc. 216 at 23 n.4, so the court will proceed to address those that remain, beginning with the breach of Term Sheet claim, to which the parties devote most of their briefing.

### I. Breach of Term Sheet Claim

"A breach of contract claim requires … the existence of a valid and enforceable contractual promise … ." *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 858 (7th Cir. 2019). Etransmedia contends that the Term Sheet is a non-binding, preliminary statement of proposed settlement terms and therefore cannot give rise to a breach of contract claim. Doc. 208 at 9-18.

Although the Term Sheet was negotiated and executed in New York, Illinois law governs whether it is a binding contract. If "[n]o party raises a choice of law issue," the court "appl[ies] the law of the forum state." *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 345 (7th Cir. 2010). "A district court is required to engage in a choice of law analysis

4

only if there is a conflict between Illinois law and the law of another state such that a difference in law will make a difference in the outcome." *Bd. of Forensic Document Exam'rs, Inc. v. ABA*, 922 F.3d 827, 831 (7th Cir. 2019) (internal quotation marks omitted). It is "incumbent on … the party seeking a choice of law determination[] to establish the existence of an outcome-determinative conflict." *Ibid*. (internal quotation marks omitted); *see also West Side Salvage, Inc. v. RSUI Indem. Co.*, 878 F.3d 219, 223 (7th Cir. 2017) ("The party who seeks a choice-of-law determination must establish the existence of an outcome-determinative conflict."). Because Etransmedia does not attempt to establish a conflict between New York and Illinois law—indeed, it argues that the two dictate the same result—the court applies Illinois law. *See West Side Salvage*, 878 F.3d at 223 ("If the party fails to establish the existence of such a conflict, the court applies the law of the forum state."); *Bd. of Forensic Document Exam'rs*, 922 F.3d at 831 (holding that "the district court committed no error in applying the law of the forum state" where the parties "did not identify any specific conflict in the laws of the pertinent states").

"Illinois conditions the enforceability of a putative contract on two predicates: a sufficiently concrete expression of the essential terms of the agreement, as well as an intent to be bound by that agreement." *Ocean Atl. Dev. Corp. v. Aurora Christian Sch., Inc.*, 322 F.3d 983, 995 (7th Cir. 2003). In the context of a settlement agreement, that means that a "settlement agreement is enforceable if there was a meeting of the minds or mutual assent to all material terms." *Beverly v. Abbott Labs.*, 817 F.3d 328, 333 (7th Cir. 2016). "If the terms of the [purported agreement] unambiguously indicate that [it was] merely [a] tentative agreement[] to agree, leaving material terms unresolved, then there was no binding contract" and summary judgment for the defendant is appropriate. *Ocean Atl.*, 322 F.3d at 996. "If, on the other hand, the [purported agreement] appear[s] to include all terms essential to the deal and manifest[s] the

5

parties' mutual intent to be bound by those terms, or at the least [is] ambiguous in that respect, then whether or not a binding agreement exists is a question that must be resolved at trial." *Ibid*.

The mere fact that "a formal written document is anticipated does not preclude enforcement of a specific preliminary promise." *Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr.*, 692 F.3d 580, 588 (7th Cir. 2012) (internal quotation marks omitted). Accordingly, "[t]he fact that parties contemplate that a formal agreement will eventually be executed does not necessarily render prior agreements mere negotiations, where … the ultimate contract will be substantially based upon the same terms as the previous document." *Ibid*. (ellipsis in original and internal quotation marks omitted). By contrast, "[a] preliminary writing that reflects a tentative agreement contingent upon the successful completion of negotiations that are ongoing[] does not amount to a contract that binds the parties." *Id*. at 587 (internal quotation marks omitted). Even if a document "does not expressly state that the parties' agreement [is] subject to a more definitive document, magic words are not required" to accomplish that result. *Ibid*. In the end, "[i]f the parties' written words do not show a clear intent [to] be bound, then they will not be held to a preliminary agreement." *Id*. at 588 (first alteration in original and internal quotation marks omitted). That is because the law aims to "permit[] parties to … reach[] agreement in stages without taking the risk that courts will enforce a partial bargain that one side or the other would have rejected as incomplete." *Ibid*. (second alteration in original and internal quotation marks omitted).[*]

---

[*] There is another sense in which the law allows a preliminary agreement to be binding, but it is irrelevant here. As the Seventh Circuit has recognized, "agreements to negotiate toward the formation of a contract are themselves enforceable as contracts if the parties intended to be legally bound." *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 96 F.3d 275, 277 (7th Cir. 1996); *see also Citadel Grp.*, 692 F.3d at 592 ("An agreement to negotiate in good faith is a

6

"Under Illinois law, courts focus on the parties' intentions to determine whether an enforceable contract comes into being during the course of negotiations, or whether some type of formalization of the agreement is required before it becomes binding." *Ibid.* (internal quotation marks omitted). The court must "consider, among other things, the complexity of the agreement, the amount of money involved, whether the agreement requires a formal writing for full expression of its terms, and whether the negotiations indicate that a formal written document is contemplated." *Ibid.* "Importantly, the intent to be bound is measured objectively, by the parties' words and conduct, not their stated subjective intent as to the meaning of the agreement." *Ibid.* (internal quotation marks omitted). "[T]he omission of crucial terms is powerful evidence that no contract was intended." *Ibid.* (modification in original and internal quotation marks omitted). Indeed, a "contract requires mutual assent (determined by the [parties'] objective conduct) as to *all* material terms," and the "[i]ndefiniteness of a material term renders a contract unenforceable when the court cannot reasonably supply the missing term." *Id.* at 589 (emphasis added). Likewise, "when the parties make clear that their mutual obligations are dependent upon the execution of a final contract"—for instance, where "several key obligations and events … [are] to be triggered by the execution of the anticipated contract"— then "their preliminary writing will not be deemed a binding agreement." *Ocean Atl.*, 322 F.3d at 997. Pertinent here, where parties intending to settle a dispute "explicitly leave[] the details of

---

contract."). Allscripts, however, does not in its summary judgment opposition brief argue for construing the Term Sheet in that manner, and therefore has forfeited that argument as a basis for denying summary judgment on the breach of Term Sheet claim. *See Gates*, 916 F.3d at 641 ("The district court was not required to address a claim or theory that plaintiff did not assert [in opposition to summary judgment]."); *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.").

7

[a] release provision[] open for future negotiation," they have—at least in the ordinary case—left out an "inherently material" term. *Abbott Labs. v. Alpha Therapeutic Corp.*, 164 F.3d 385, 388 (7th Cir. 1999); *see also Higbee v. Sentry Ins. Co.*, 253 F.3d 994, 997-98 (7th Cir. 2001) ("[W]e think many defendants would agree that the *most* material term in any settlement agreement is the release and, in a case involving multiple claims, which of those claims are covered by the release.") (citation omitted).

Several features of the Term Sheet establish that it is not a binding contract. First, nothing in the Term Sheet expressly indicates an intention by the parties to be bound. Second, the Term Sheet leaves unspecified what is required for the contemplated general releases to be "mutually satisfactory," and expressly leaves for future negotiation over the "final settlement agreement" all "issues relating to cross-claims for indemnification arising from third-party claims not yet resolved." Doc. 202-11 at 2. Third, the Term Sheet makes clear that the parties are not expected to dismiss their pending claims until after execution of the comprehensive settlement agreement. *Ibid.* As the above-cited precedents make clear, the absence of undisputedly material terms coupled with the express conditioning of some obligations on the execution of a future agreement are hallmarks of a document that is preliminary and non-binding. *See also Mays v. Trump Ind., Inc.*, 255 F.3d 351, 357-58 (7th Cir. 2001) ("Under … the law of every jurisdiction, a meeting of the minds on all essential terms must exist in order to form a binding contract. And a mere agreement to agree does not a binding contract make. … Without an express statement of intent, the focus is on whether the contract is too indefinite to enforce. Thus, the existence or nonexistence of a contract turns on whether material terms are missing."); *Ocean Atl.*, 322 F.3d at 999 ("The parties may … make clear that they do not intend to be bound until a contract is executed … by making … key events … dependent upon the

subsequent execution of a contract … ."). That is particularly so where, as here, the document concerns a substantial transaction and the complex handover of business relationships. *See Quake Const., Inc. v. Am. Airlines, Inc.*, 565 N.E.2d 990, 994 (Ill. 1990) (holding that courts, in determining whether the parties intended to be bound by a preliminary letter of intent, should consider "whether the agreement contains many or few details" and "whether the agreement involves a large or small amount of money"); *A.T.N., Inc. v. McAirlaid's Vliesstoffe GmbH & Co., KG*, 2008 WL 696916, at *5 (N.D. Ill. Mar. 11, 2008) ("Other things being equal, it is unlikely that sophisticated parties intend to be bound by a skeletal agreement, containing few terms and conditions, when their transaction is complex and millions of dollars are at stake."), *aff'd*, 557 F.3d 483 (7th Cir. 2009).

Citing *Seko Worldwide, LLC v. Four Soft Ltd.*, 503 F. Supp. 2d 1059, 1060-61 (N.D. Ill. 2007), Allscripts argues that "a contract that contains the material terms is enforceable unless it is 'expressly conditioned' on a future agreement." Doc. 216 at 17. Allscripts's argument misreads that decision. *Seko Worldwide* quotes *Abbott Laboratories* for the proposition that "[i]nformal writings between parties *can* constitute a binding settlement agreement unless the parties decide to expressly condition their deal on the signing of a formal document." *Seko Worldwide*, 503 F. Supp. 2d at 1061 (quoting *Abbott Labs.*, 164 F.3d at 388) (emphasis added). That passage conveys only that the *inclusion* of such an express condition *prevents* a court from holding that a preliminary agreement was binding, not that the *absence* of such a condition *suffices* to show that an agreement was binding. Indeed, the above-cited Seventh Circuit authority, which sets forth the circumstances in which a preliminary agreement lacking such conditioning language should nonetheless be considered nonbinding, necessarily defeats Allscripts's position. *See Ocean Atl.*, 322 F.3d at 999 ("[J]ust as language anticipating the

9

execution of a final contract does not rule out the possibility that the parties intended for their preliminary writing to bind them, neither does the absence of a 'subject to' clause carry talismanic significance. The parties may through other means make clear that they do not intend to be bound until a contract is executed.").

The other decisions cited by Allscripts, Doc. 216 at 16, are equally unhelpful. As an initial matter, those decisions address whether an oral settlement agreement is sufficiently definite to be enforced, not whether a preliminary agreement that contemplates later formalization is a binding contract. *See Wilson v. Wilson*, 46 F.3d 660, 664-67 (7th Cir. 1995) (affirming enforcement of an oral settlement agreement, after repeated assurances by the defendants that a binding settlement agreement had been reached, even though it did not specify the legal form that the mutual releases would take); *In re Marriage of Cole & McElwain*, 2018 WL 650475, at *5-6 (Ill. App. Jan. 30, 2018) (affirming enforcement of an oral settlement agreement where "enforcement of that agreement was not contingent on an executed agreed order" and where the agreement "was clear, certain, and definite in its material provisions," even though payment dates were undetermined); *Ice Glass Prints Fla., LLC v. Surprize LLC*, 2010 WL 1702195, at *5-7 (N.D. Ill. Apr. 27, 2010) (enforcing an oral settlement agreement where "agreement as to all of the material terms was reached," even though the use of certain names, trademarks, and logos remained unresolved); *Flood v. Ty, Inc.*, 2005 WL 994579, at *11 (N.D. Ill. Apr. 5, 2005) (enforcing an oral settlement agreement that resolved "the essential and material terms of the settlement agreement," despite one party subsequently raising issues related to confidentiality and the release of an attorney's lien).

Those decisions are inapposite for other reasons as well. In *Wilson*, the party contesting the contract's existence had previously acknowledged that the parties had entered into a

settlement agreement. 46 F.3d at 663. Reviewing the district court's decision under an abuse of discretion standard, and emphasizing that the unresolved terms concerned not whether or under which conditions a release of claims would occur, but rather the legal form such releases would take—a mutual release or a mutual covenant—the Seventh Circuit affirmed the district court's decision to enforce the oral settlement agreement. *Id*. at 662-66. Here, no such indicia of intent to be bound are present, the unresolved issues in the Term Sheet are more substantial than those in *Wilson*, and the Term Sheet expressly conditioned some obligations on future execution of the formal settlement agreement. In *Flood*, the court considered open terms related to confidentiality and the release of an attorney's lien, not the release of claims implicated in ongoing litigation. 2005 WL 994579, at *11. Moreover, the oral agreement in *Flood* did not leave open terms comparable to those that the Term Sheet left open; rather, the parties' disputes arose after the fact, when one party "raised, for the first time, the issue[s]" they had not resolved orally. *Ibid*. In *Marriage of Cole & McElwain*, the parties' agreement left open only payment dates, 2018 WL 650475, at *5, and in *Ice Glass Prints*, the court observed that the parties *had* agreed to mutual releases and the dismissal with prejudice of *all* litigation, and that the unresolved terms concerned only "minor differences," 2010 WL 1702195, at *5.

In sum, because the Term Sheet indisputably is not a binding contract, Allscripts cannot prevail on its contract claim for breach of the Term Sheet. *See Doe*, 933 F.3d at 858.

**II.    Other Claims**

In the last three pages of its oversized initial brief, Etransmedia argues that Allscripts has failed to offer evidence supporting both liability and damages as to its other claims. Doc. 208 at 27-29. But Allscripts adduces evidence that it began to perform under the Term Sheet by upgrading client software to the MU 2014 package. Doc. 224 at ¶¶ 4, 21-22; Doc. 202-11. That

11

forms the evidentiary basis for Allscripts's claims for breach of an implied contract formed by the parties' conduct and for unjust enrichment. *See Marcatante v. City of Chicago*, 657 F.3d 433, 440 (7th Cir. 2011) ("Pursuant to Illinois law … , an implied contract is created by law as a result of the parties' conduct."); *Stefanski v. City of Chicago*, 28 N.E.3d 967, 980 (Ill. App. 2015) ("To state a claim for unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.") (internal quotation marks omitted). Allscripts also adduces deposition testimony by Renee Smith, the Etransmedia representative, Doc. 217-8 at 24, showing that Etransmedia used a form contract providing that its clients "shall not permit Allscripts or any of its affiliates or subsidiaries to host any data transferred as a result of this Agreement." Doc. 217-17 at 4. That forms a basis for Allscripts's tortious interference and unfair trade practices claims. *See Ali v. Shaw*, 481 F.3d 942, 944 (7th Cir. 2007) ("To succeed in an action for tortious interference with prospective economic advantage under Illinois law, the plaintiff must prove: (1) the plaintiff's reasonable expectation of a future business relationship; (2) the defendant's knowledge of that expectation; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectations from ripening; and (4) damages."); *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 830 (7th Cir. 2014) ("Illinois's Consumer Fraud Act is intended to protect consumers from unfair methods of competition and other unfair and deceptive business practices. … In determining whether particular conduct is unfair, [courts] … ask whether the practice (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers.").

      Perhaps Etransmedia could have argued that Allscripts's evidence was legally inadequate to find liability on those claims. But it makes no such argument, and instead merely contends,

with little to no elaboration, that Allscripts "has produced not *one whit* of evidence on any of these claims." Doc. 208 at 28 (emphasis added). That contention is incorrect, and the court will not make for Etransmedia the legal arguments it might have made. *See M.G. Skinner & Assocs. Ins. Agency v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("We apply [the forfeiture] rule where a party fails to develop arguments related to a discrete issue … .").

As for damages, Allscripts adduces its expert's analysis of lost profits and summaries of the amounts owed for services rendered. Doc. 216 at 24 (citing Doc. 217 at pp. 13-14, ¶ 41). Rather than challenge that evidence, Etransmedia dismisses it as "precious little factual support for [Allscripts's] damages." Doc. 225 at 18. That vague and contentless argument cannot win the day on summary judgment.

Etransmedia next observes that Allscripts relies on only information and belief in its interrogatory response as to which of its client relationships suffered as a result of Etransmedia's actions. Doc. 208 at 28. That argument fails as well. Even if Allscripts's interrogatory response is not evidence, it nonetheless clearly identifies the client relationships that Allscripts believes Etransmedia interfered with. Moreover, Etransmedia does not explain why the identification of specific client relationships lost or damaged is essential to Allscripts's damages case at the summary judgment stage, and it is far from apparent how it would affect, for instance, Allscripts's claims related to part performance. Finally, Smith's testimony indicates that Etransmedia's standard client contract included the provision restricting clients' ability to use Allscripts to host transferred data, allowing the reasonable inference that Etransmedia interfered with all its clients' relationships with Allscripts. Doc. 217-8 at 24; Doc. 217-17 at 4.

Etransmedia also appears to object to Allscripts seeking damages under alternative theories. Doc. 208 at 28. But as Allscripts correctly observes, it is not seeking a double recovery and may pursue a variety of legal theories in pursuit of a single recovery. Doc. 216 at 24-25; *see Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1548 (7th Cir. 1990) ("Fed. R. Civ. P. 8(e)(2) allows a party to take inconsistent positions in a single suit … because, at the end of the day, only one of these positions can obtain, and the pleader is limited to a single recovery no matter how many different (and conflicting) theories it offers."); *Holmes v. Boehringer Ingelheim Pharms., Inc.*, 158 F. Supp. 2d 866, 868 (N.D. Ill. 2001) ("A right of recovery is distinct from a theory of liability; a plaintiff may have only one right of recovery though she advances a variety of legal theories to support that recovery.") (internal quotation marks omitted).

All that said, Etransmedia is entitled to summary judgment on Allscripts's defamation claim. Etransmedia argues that Allscripts "identif[ied] no false statements known to be false made by Etransmedia," Doc. 208 at 28, and Allscripts's response brief says nothing whatsoever about defamation. Although Allscripts's Local Rule 56.1(b)(3)(B) response mentions potentially defamatory statements, Doc. 217 at p. 20-21, ¶ 30, Allscripts makes no argument in its brief as to why those statements are defamatory under governing law. Accordingly, Allscripts has forfeited any answer to Etransmedia's argument for judgment on the defamation claim. *See Gates*, 916 F.3d at 641; *Nichols*, 755 F.3d at 600.

## Conclusion

Etransmedia's summary judgment motion is granted as to Allscripts's defamation, declaratory judgment, and breach of Term Sheet claims. The motion is denied as to Allscripts's breach of implied contract, unjust enrichment, tortious interference with prospective economic

14

advantage, and unfair and deceptive trade practices claims, which will proceed to trial. Allscripts's motion to strike portions of Etransmedia's Local Rule 56.1 materials, Doc. 218, is denied as moot because the court does not rely on the materials to which Allscripts objects.

Before concluding, the court notes that in a companion case brought by Etransmedia against Allscripts, *Etransmedia Technologies, Inc. v. Allscripts Healthcare, LLC*, No. 17 C 4383 (N.D. Ill.), the court granted summary judgment to Allscripts on the ground that Etransmedia is not the real party in interest under Rule 17(a)(1) and that the real parties in interest could not join the suit under Rule 17(a)(3). Neither party raises a Rule 17(a) issue in this case, so the court will grant or withhold judgment on real-party-in-interest grounds. *See Gates*, 916 F.3d at 641; *Nichols*, 755 F.3d at 600.

December 24, 2019        _____
                                                                United States District Judge